IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
(MARTINSBURG DIVISION)

| | |
|---|---|
| AUTOMATED MERCHANDISING SYSTEMS INC. <br><br> Plaintiff, <br><br> v. <br><br> CRANE CO., and SEAGA MANUFACTURING, INC., <br><br> Defendants. | Civil Action Nos. 3:03-CV-88-JPB *(Lead Case)*, 3:04-CV-48-JPB, 3:04-CV-75-JPB; 3:04-CV-80-JPB; 3:08-CV-97 |

## PLAINTIFF AMS' MOTION TO LIFT THE STAY

Charles F. Printz, Jr. (WVSB #2985)
Brian M. Peterson (WVSB #7770)
BOWLES RICE MCDAVID GRAFF
  & LOVE LLP
P.O. Drawer 1419
Martinsburg, West Virginia 25402-1419
Telephone: 304-263-0836
Facsimile:  304-267-3822

James D. Berquist
Donald L. Jackson
DAVIDSON BERQUIST JACKSON
  & GOWDEY, LLP
4300 Wilson Blvd., Suite 700
Arlington, Virginia 22203
Telephone: 703-894-6400
Facsimile:  703-894-6430

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ II

I.   BACKGROUND ........................................................................................................1

II.  ARGUMENT...............................................................................................................3

    A.   It Took The Patent Office More Than Four Years To Reach The
        Conclusion AMS Reached By June 2005..........................................................3

    B.   The Stay Should Be Lifted ................................................................................6

        1.   Further Delay Prejudices AMS ...............................................................7

        2.   Crane's Refusal To Prosecute Its Infringements Claims Under The
            '014 Patent (Or Defend Against AMS' Related Declaratory
            Judgment Action) Is Also Prejudicing AMS ........................................10

        3.   Maintaining The Stay Will Not Simplify The Case...............................11

III. CONCLUSION..........................................................................................................13

## TABLE OF AUTHORITIES

**Cases**

*Ariba, Inc. v. Emptoris, Inc.*,
    2007 U.S. Dist. LEXIS 78857, *2-3 (E.D. Tex. 2007) ........................................................ 7

*Cooper Techs. Co. v. Thomas & Betts Corp.*,
    2008 U.S. Dist. LEXIS 25938, *3 (E.D. Tex. 2008) .......................................................... 6

*Jones v. Hardy,*
    727 F.2d 1524, 1527-28 (Fed. Cir. 1984) ........................................................................ 13

*Landis v. N. Am. Co.*,
    299 U.S. 248, 254 (1936) .................................................................................................. 7

The United States Patent and Trademark Office ("USPTO") recently decided to confirm each and every one of the claims of United States Patent Nos. 6,384,402 ("the '402 patent") and 6,794,634 ("the '634 patent") and to terminate the six reexaminations Crane initiated of these two patents. Accordingly, plaintiff, Automated Merchandising Systems Inc. ("AMS"), moves this Court for an Order lifting the stay of this action. In the alternative, AMS requests that this Court lift the stay as to at least AMS' claims that the defendants infringe the '402 and '634 patents.

## I.     BACKGROUND

On June 13, 2005, Judge Broadwater stayed this action until the USPTO completed reexamination of the '402 patent and the '634 patent. The USPTO had initiated three reexamination proceedings for each of AMS' two patent at the request of defendant Crane Co. ("Crane"). At the time the stay was entered, this case consisted of four consolidated actions, 3:03-CV-88-JPB *(Lead Case)*, 3:04-CV-48-JPB, 3:04-CV-75-JPB; 3:04-CV-80-JPB. These four actions involved cross-claims regarding these AMS two patents, and cross-claims involving one of Crane's patents, United States Patent No. 6,732,014 ("the '014 patent").[1]

On June 26, 2009, the USPTO Board of Patent Appeals and Interferences ("the Board") reversed the Examiner's decision finding that several of the claims of the '402 and '634 were not patentable. A copy of these decisions is attached at Tabs 1 and 2, respectively. Consistent with those Board decisions, the Examiner handling these reexaminations issued an Intent to Issue a reexamination certificate confirming the patentability of each and every claim of the '402 patent on July 31, 2009. A copy of that Notice is attached at Tab 3. Similarly, on August 5, 2009, the

---

[1] On June 2, 2008, AMS filed a further action in this Court accusing Crane of infringing two more AMS patents, United States Patent Nos. 7,191,915 and 7,343,220, and accusing a former licensee, Seaga Manufacturing Inc., of infringing these two patents as well and the '634

Examiner issued an Intent to Issue a reexamination certificate confirming the patentability of each and every claim of the '634 patent. A copy of that Notice is attached at Tab 4. The PTO Bibliographic Data for these two reexamination proceedings reports the status of each as: "**Reexam Terminated** – Notice of Intent to Issue a Reexamination Certificate Mailed." *See* PTO Bibliographic Data attached at Tabs 5 and 6 (emphasis added).

In short, the PTO has now completed the reexamination of the '402 and '634 patents. A Reexamination Certificate confirming each and every one of the claims of these two patents asserted against Crane (and now Seaga) will issue within the next 4-6 weeks. Having completed this lengthy reexamination process, AMS respectfully requests an Order lifting the stay as to at least these two AMS patents and Crane's '014 patent.[2]

The patent infringement dispute between AMS and Crane has been pending for more than five and a half years while Crane has continued to sell the very products AMS has accused of infringement since late 2003. Crane took full advantage of the delay provided by the 2005 stay, using that time to a) dramatically increase its share of the vending machine market, b) expand the extent of its use of AMS' patented technology (adding even the so-called "GoldenEye" vend sensor adjudicated to infringe in AMS' earlier litigation with Automatic Products International, Ltd. ("AP") to certain product lines) (Consent Judgment attached at Exh. 7), c) increase its direct competition with AMS, and d) significantly reduce AMS' license revenue. Worse, Crane has

---

and '402 patents. By Order of December 2, 2008, this new action, 3:08-CV-97, was consolidated with the other four actions and stayed.

[2] Crane also filed a reexamination request on its own '014 patent. Although Crane was forced to extensively modify the claims of the '014 patent, that reexamination concluded *in 2007*, almost two years ago  Crane has resisted even AMS' efforts to move this litigation forward even as to its own '014 patent. That issue, and the reasons behind Crane's reluctance to litigate that patent are addressed in Section II.B.2, below.

done all of this while AMS could do nothing more that sit idly while the USPTO continued its process. That process has now concluded, and it is time to move this six year old dispute to resolution.

## II.     ARGUMENT

Under Judge Broadwater's December 30, 2004 Case Scheduling Order, discovery in the cases stayed by the June 13, 2005 Order was to be completed by September 15, 2005 and trial was set for December 5, 2005. Thus, at the time of the stay order, the earliest filed case had been pending for two and a half years and discovery was set to close in just three months. The case was not in its early stages as Crane has previously suggested. Rather, the case was accelerating towards trial. It was at that junction that Crane realized it needed to de-rail the process – Crane's solution was to file six reexamination requests, three for each of the two AMS' patents at issue.

### A.     It Took The Patent Office More Than Four Years To Reach The Conclusion AMS Reached By June 2005

Prior to the AMS inventions, the use of product delivery sensors were not totally unknown in the vending machine art. The use of such sensors, however, fell into one of three categories – they were (a) used in combination with an internal chute in a solid front vendor (non-transparent front), (b) positioned where the product was stored, or (c) placed in the product retrieval bin and functioned as part of a product lowering elevator. In the third system, the sensor system was activated by the elevator when it reached the bottom of the retrieval bin and was used to determine if product was on the evaluator ready for retrieval by the customer. If a product was detected in the retrieval bin, then the sensor sent a signal which unlocked the retrieval bin door. The retrieval bin door served the very important function of preventing access to the retrieval bin while the elevator was moving. This last system, described in United States Patent No. 4,252,250 to Toth

("the Toth '250 patent"), was very well know to defendant Crane. A copy of that patent is attached as Exhibit 8. Crane's predecessor, UMC, owned that patent, and Crane commercialized that technology in products sold in the late 1970's and early 1980's.

In the six reexamination requests it filed, Crane relied heavily upon the Toth '250 patent and prior art solid front vendor which utilized an internal chute to channel products through an narrowing passage way to a sensor. Both categories of prior art had been fully considered during examination of the applications that became the '402 and '634 patents – indeed, both approaches, and the Toth '250 patent, were known to the Examiner who handled the applications that became the '402 and '634 patents. Thus, AMS believed that the examiner initially assigned to handle Crane's six reexaminations, Examiner David Spector (in Art Unit 2873), would read the file, see the problems with Crane's arguments, and confirm the patentability of AMS' patents without delay. It was on this basis that AMS agreed to join Crane's motion to stay the pending litigation. In AMS' view, the Examiner handling these reexaminations would recognize the fundamental differences between the Toth patent and AMS' inventions and would be able to wrap up the reexaminations relatively quickly. AMS' belief turned out to be wrong.

In early 2006, the USPTO transferred the six reexaminations Crane had initiated to a newly created Central Reexamination Unit within the PTO (Unit 3993), and assigned them to a new examiner, Examiner English. While AMS does not know what experience Examiner English had with the technology examined in Art Unit 2873, or the vending machine field generally, it does appear from his analysis that he bought Crane's arguments regarding the Toth '250 patent hook, line and sinker. In his *first* office action, issued June 12, 2006, more than a year into the stay, Examiner English rejected the broadest claims of the '402 patent on the grounds that it was not patentable over the Toth '250 patent in combination with other alleged prior art. Examiner

English took the position that the Toth patent disclosed sensing products as they fall. Examiner English took the same position with regard to the claims of AMS' 634 patent on that same day.

In its July 12, 2006 responses to those actions, AMS argued that, among other things, the Examiner had misconstrued the Toth '250 patent. (*See e.g.* Exh. 9, pp. 11-15).[3] AMS explained that in the Toth device, the sensor system is not active until the product lowering elevator has stopped at the bottom of the retrieval bin. Thus, unlike AMS' claimed invention, AMS argued, Toth does not teach the detection of products as they fall through the vend space. Examiner English rejected AMS' description and confirmed his view of Toth in the second office action issued October 20, 2006. (*See* Exh. 10, p. 5) (asserting that "Toth's sensing system detects an article as it is moved by the elevator through the vend space"). On November 20, 2006, AMS again tried to dissuade the Examiner from adherence to Crane's arguments. (*See* Exh. 11, pp. 1-8). But AMS again failed. (*See* Examiner's Advisory Action of December 8, 2009, attached as Exh. 12). AMS, however, appealed that decision to the USPTO Board on November 20, 2007.

On June 26, 2009, more than four years after this action was stayed, the USPTO Board issued its decisions in these reexaminations. The Board succinctly stated its basis for reversing Examiner English:

> Thus, the Examiner's articulated application of the vend-sensing system of Toth in the vending machine of Schuller results in a vending machine having emitters that are positioned at the customer-accessible hopper (i.e. adjacent the customer accessible opening 71 of Schuller) where the vended article comes to rest. The Examiner has not articulated a rational reason as to why one of ordinary skill in the art, in incorporating the vend-sensing system of Toth into the vending machine of Schuller, would further modify

---

[3] Despite having taken more than 12 months to issue a *first* office action, pursuant to USPTO rules implementing the "special dispatch" requirement imposed on reexamination proceedings under Section 305 of the Patent Act, AMS was provided *one month* to file its responses.

>the positioning of the emitters so that they are positioned before the
>location where the article comes to rest as recited in the rejected claims.

(Exh. 1, p. 11). In short, the Board of Appeals rejected Crane's analysis in favor of the one AMS had been advancing *for years.* In reversing every one of the Examiner's rejections, the Board did not feel it necessary to consider AMS' five *other* arguments. (*Id.* at 11-12). This was the result AMS expected in June 2005 when it agreed to the stay Crane was proposing. AMS, however, never thought it would take more than four years, and an appeal to the Board, before the USPTO would reach that same conclusion. That, however, is now water under the bridge - all six Crane reexaminations of these patents have been terminated.

To the extent that AMS carries part of the blame for having agreed to original stay, AMS has paid the price. Now that those proceedings are at an end, AMS cannot be blamed for any delay from this point forward. AMS has learned its lesson, it has not, and will not, agree to stay litigation pending reexamination of its patents. AMS has learned that it may take years, and an appeal to the Board, in order to prevail over even demonstrably wrong invalidity contentions.

**B.     The Stay Should Be Lifted**

Courts consider the following three factors in deciding whether to grant a stay in favor of reexamination proceedings: "(1) whether a stay will unduly prejudice or present a clear tactical advantage to the nonmoving party, (2) whether a stay will simplify the issues in question and trial of the case, and (3) whether discovery is complete and whether a trial date has been set." *Cooper Techs. Co. v. Thomas & Betts Corp.*, 2008 U.S. Dist. LEXIS 25938, *3 (E.D. Tex. 2008). The party seeking to stay an action "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Ariba, Inc. v. Emptoris, Inc.*, 2007 U.S. Dist. LEXIS 78857, *2-3 (E.D.

Tex. 2007) (*quoting Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). The Supreme Court has long objected to lengthy stays of indefinite duration. *Landis*, 299 U.S. at 257 ("an order which is to continue by its terms for an immoderate stretch of time is not to be upheld as moderate because conceivably the court that made it may be persuaded at a later time to undo what it has done.").

### 1.  **Further Delay Prejudices AMS**

This is not a case where the patent owner is not in direct competition with the accused infringer – Crane and AMS have been competitors and Crane's actions over the past three years have only heightened that competition. Not only has Crane continued selling the products AMS has accused of infringement since December 2003, in 2006 Crane acquired the assets of AP, the second biggest company in the vending machine industry. Included in that acquisition was the right to continue selling the AP brand vending machines equipped with the so-called "Golden-Eye" vend detection system.

The fact that vending machines equipped with the "Golden-Eye" vend detection system was adjudicated to infringe AMS' '402 patent did not stop Crane from selling those same products following the 2006 acquisition. (*See* AP Consent Judgment, Exh. 7). Crane did not even bother to ask AMS to transfer AP's license to it <u>or</u> offer to continue paying the royalty AP had been paying – Crane simply assimilated the AP products (and distribution network) into their business. By doing so, Crane dramatically expanded the scale of their infringement (perhaps even doubling the number of infringing sales annually) and increased its direct competition with AMS. Neither the existence of this lawsuit, nor the Consent Judgment against AP, deterred Crane from expanding its infringing activity.

Moreover, and as this Court well knows, in early 2008, Crane introduced a new product line under the Fusion/UltraFlex trade names. Crane chose to equip the vending machines

in this product line with the adjudicated "Golden-Eye" vend detection system developed by AP. Crane also used this product line to introduce a newly designed, fully insulated cabinet in an effort to push AMS out of the market niche it had created for itself. Having received two more patents that cover Crane's products, AMS filed a fifth action on June 2, 2008 and on July 29, 2008 asked this Court to preliminarily enjoin Crane's sales of its Fusion/UltraFlex vending machines. On December 2, 2008, this Court granted AMS' motion. Thereafter, however, this Court also granted Crane's motion to stay the preliminary injunction pending appeal to the Court of Appeals for the Federal Circuit. Briefing in that appeal has only just concluded, and no hearing has been scheduled yet.[4]

In short, despite years of effort, and this Court's entry of a preliminary injunction against certain sales, AMS' efforts have yet to stop Crane from making even one sale, including sales of the products which irreparably injure AMS. To the contrary, Crane has used the delay to great advantage by increasing both the level and the extent of its infringement. It is now time to put an end to Crane's infringement, and to protect AMS' ability to control the technology as provided by the Patent Act. 35 U.S.C. § 154(a) (patent grants to the patentee "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States…").

Continued delay is prejudicing AMS in other ways too. The passage of time will degrade or possibly even destroy evidence. The only questions are how much evidence will be

---

[4] On March 5, 2009, Crane moved for a two week extension of time to file its Opening Brief with the Federal Circuit. That motion was granted over AMS' objection. On March 31, 2009, Crane filed both its 1) Opening Brief and 2) a motion to dismiss the appeal on the grounds that the Order granting the preliminary injunction was not appealable because it had not gone into effect. Crane's combination of filings delayed briefing substantially, and may still result in a return of the issue to this Court without a ruling on the decisions on appeal.

compromised and how badly that evidence will be compromised. It is not possible to identify all of the information that might be lost. Indeed, if AMS could identify the information most vulnerable to being lost, it would take additional steps to prevent that loss. But AMS is not in control of all of the relevant information and cannot predict what information is most at risk with any certainty. Moreover, contrary to Crane's previous suggestion, the existence of the reexamination does little to preserve evidence or witness memories. As the reexamination filings attached as Exhibits 1- 6 and 8-12 should make abundantly clear, the reexamination process is directed to evaluating only the content of prior art disclosures and the legal evaluation of whether the content of the prior art is such as to render the claimed invention obvious, which is but one of many issues to be tried in this case. The process, which is largely between counsel and the USPTO examiner, is highly technical and legally nuanced. It does little or nothing to preserve sales documentation or witness memory as to events which occurred in the market years ago.

        The passage of time creates other, more specific, concerns for AMS. Mr. Roy Steeley, the founder of AMS and the person who drove the development of the patented technology is 90 years old. (*See* Steeley Declaration, Exh. 13). If trial were to begin today, AMS would present Mr. Steeley as its' first trial witness. It was Mr. Steeley's insight into the vending machine marketplace that created AMS and set the stage for the development of the patented technology. It was Mr. Steeley who decided that he could break into the well-established vending machine market and compete against the likes of Crane and Automatic Products ("AP") so long as he had a vending machine that would either deliver the product or provide a refund. It was Mr. Steeley who decided to obtain patent protection for the inventive technology developed, and it was Mr. Steeley who led AMS into becoming the company it is today. It was Mr. Steeley who negotiated a settlement of AMS' first infringement suit against AP and was at the heart of the

decision to bring an action against Crane in late 2003. Mr. Steeley has a story to tell about his achievements and the role the patented technology played in those achievements. Mr. Steeley should be provided the opportunity to tell that story and to see the conclusion of the litigation he started almost nine years ago.

AMS also seeks a lifting of the stay in order to amend its pleadings to include a breach of contract action against Defendants Seaga, the former licensee under AMS' patents who failed to make the required license payments. Although AMS still does not know when Seaga made its first sale of a vending machine which incorporated the patented technology, and thus started Seaga's royalty obligations, but it does know that the statute of limitations continues to run while the present action between those parties is stayed. Moreover, AMS' breach of contract action is separate from AMS' patent infringement claims. Indeed, a breach of contract claim for unpaid patent royalties survives even a finding that a patent is invalid.

### 2. Crane's Refusal To Prosecute Its Infringements Claims Under The '014 Patent (Or Defend Against AMS' Related Declaratory Judgment Action) Is Also Prejudicing AMS

AMS and Crane have had cross-claims pending against each other relating to Crane's '014 patent since 2004. AMS has always been of the belief that the claims of the '014 patent are invalid in light of prior art not considered by the USPTO during either the original prosecution of the application that became the '014 patent or the reexamination of that patent. Nevertheless, out of an abundance of caution, AMS modified its optical vend detection system to eliminate any basis to accuse AMS of infringing the '014 patent.

AMS' redesign, however, did not come without expense. In addition to the up front design charges AMS was forced to incur, AMS' redesigned vend detector uses approximately twice the number of infrared detectors used in the earlier, allegedly infringing

version. The additional cost, per vendor, is more than $20. (Shull Decl., Exh. 14, ¶3). Thus, Crane's infringement allegations under the '014 patent are currently costing AMS $20 per machine sold. AMS has been forced to absorb those additional per vendor costs for more than three years, with no end in sight.

The reexamination of Crane's '014 patent ended *almost two years ago*. Although Crane appears willing to defer the assertion of its patent against AMS, AMS is not. The continued delay is costing AMS money. If, as AMS believes, the claims of the '014 patent are invalid (or not infringed by AMS' earlier vend detector design), AMS would like to save that additional $20 per vending machine by reverting back to its earlier design. But AMS cannot remove the cloud caused by Crane's infringement charge, or revert to using its earlier, less expensive design, until the stay is lifted and the invalidity and non-infringement issues resolved. Crane's willingness to let the '014 patent infringement issues linger may have more to do with Crane's own concerns about the validity of the '014 patent than its purported desire to conserve judicial resources.

      **3.**     **Maintaining The Stay Will Not Simplify The Case**

Perhaps it was naïve for AMS to believe that a favorable resolution of the six reexaminations Crane initiated would promote resolution of this dispute. But that was one of the reasons why AMS agreed to the stay in the first place. If Crane's validity concerns could be resolved quickly and inexpensively at the USPTO, it made sense to agree to the stay. AMS was obviously wrong about how long the PTO process would take and how costly those reexaminations would prove to be. AMS also appears to have been wrong as to the effect the conclusions of those reexaminations would have. Rather than providing Crane with a basis to

reevaluate its earlier view that AMS' patents were invalid, the successful conclusion of all six reexaminations appears to have had no effect on Crane's view.

But if the reexamination process is used as a device to take a free shot at the patents, or to simply delay the district court litigation, then the value of the reexamination process is greatly diminished. The accused infringer is free to re-litigate even the invalidity assertions the USPTO rejected during the reexamination process, and the issues have not been simplified at all. Under these circumstances, the potential "benefit" of a reexamination is always one-sided. The accused infringer "wins" a reexamination by delaying resolution of the infringement claim. By contrast, the patent owner "wins" nothing by surviving a USPTO validity challenge – just the opportunity to take its claims to trial, after years of delay.

This fact has not been lost on patent practitioners, and more recently the judiciary. A team of patent litigators recently published an article explaining the benefits reexaminations provide accused infringers:

> On the other hand, accused infringers often benefit from litigation delay. For example, by delaying the progress of civil litigation, accused infringers can relieve themselves from an imminent threat of injunctive relief and also secure an opportunity to design around the asserted patent. In this regard, reexamination proceedings can be used as the basis to stay civil litigation. Through, for example, strategic filing of sequenced ex parte reexaminations, or appeal of an inter parte reexamination determination, the pendency of reexamination proceedings can be significantly extended with resulting delay in resumption of stayed civil litigation.

Ward and Soong, *Patent Disputes in This Economy: Why Your CXO of Client May Require a New Look at Reexamination as a Cost-Effective and Strategic Alternative to Litigation,* Intellectual Property Today, Vol. 16:18-20 (Aug. 2009), p. 20. (Exh. 15). As the result in this case demonstrates, stays pending reexamination are not effective at simplifying issues (but they can certainly prove prejudicial). The defendants here of course are pleased that the

reexaminations took so long, and will no doubt seek to extend that "win" by arguing in favor of continuing the stay.

But the reexaminations of the '402 and '634 patents are concluded and there is nothing to wait for. The claims of those two patents have been confirmed and there is no possibility that waiting any longer will simplify trial on these two patents. If anything, the six Crane reexaminations increased the number of issues to be tried by virtue of the new claims added to the '634 patent. Crane's artful, though erroneous, characterization of the Toth '250 patent has already yielded years of delay during which Crane was able to commercially exploit AMS' patented technology without interference from the legal system. That was an undeserved windfall. Ironically, the windfall to Defendant Seaga Manufacturing, Inc. ("Seaga") was even greater. By contract with AMS, Seaga stipulated to the validity of the '402 patent years ago. Thus, Seaga, who cannot itself challenge the validity of the '402 patent, was provided more than a year and a half of delay while the USPTO reexamined the validity of the '402 patent.

### III.   CONCLUSION

It has taken more than four years, and came at great expense to AMS, but the reexamination of the '402 and '634 patents are finally over. Not one of the claims of the '402 patent were amended. The amendments made to the claims of the '634 patent were minor (correcting a typographical error in claim 2 and revising claims 21 and 58 to recite a vending machine with a vend detector rather than a vend detector in a vending machine), and six new claims were added during the reexamination process. The claims asserted against Crane have survived Crane's invalidity challenge and a trial will be necessary on at least those patents and Crane's '014 patent. Further delay of trial on these claims will result in more delay, and more prejudice to AMS, but will not simplify the issues or conserve judicial resources. Every patent

claim represents a separately actionable invention.  *Jones v. Hardy,* 727 F.2d 1524, 1527-28 (Fed. Cir. 1984).  Thus, a trial on these claims will be necessary no matter what happens to AMS' two other patents.  AMS is aware that a successor to Judge Broadwater has not taken the bench and that this Court's resources are stretched thin, but AMS is in need of this Court's assistance to move this case forward and to put an end to the defendants' long-standing infringement.

DATED:  September 21, 2009          **AUTOMATED MERCHANDISING SYSTEMS INC.**
                                    by its Attorneys

                                    /s/ Charles F. Printz, Jr._____
                                    Charles F. Printz, Jr. (WVSB #2985)
                                    Brian M. Peterson (WVSB #7770)
                                    BOWLES RICE MCDAVID GRAFF & LOVE LLP
                                    P.O. Drawer 1419
                                    Martinsburg, West Virginia 25402-1419
                                    Telephone: 304-263-0836
                                    Facsimile:  304-267-3822

                                    James D. Berquist
                                    Donald L. Jackson
                                    DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
                                    4300 Wilson Blvd., Suite 700
                                    Arlington, Virginia 22203
                                    Telephone: 703-894-6400
                                    Facsimile:  703-894-6430

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that the counsel of record who are deemed to have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF system.  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

                                              /s/ Charles F. Printz, Jr._____
                                              Charles F. Printz, Jr.