**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**(MARTINSBURG DIVISION)**

| | |
|---|---|
| AUTOMATED MERCHANDISING SYSTEMS INC.,<br><br>             Plaintiff,<br><br>     v.<br><br>CRANE CO.,<br><br>             Defendant. | Civil Action No. **3:03-CV-88-JPB (lead case)**<br>(consolidated with 3:08-CV-97, 3:04-CV-80,<br>3:04-CV-75, and 3:04-CV-48) |

**PLAINTIFF AMS'S OPPOSITION TO CRANE'S MOTION TO EXCLUDE**
**THE TESTIMONY OF AMS'S DAMAGES EXPERT MICHELE RILEY**

## I.      INTRODUCTION

Crane misuses its Motion to Exclude Michele Riley's Testimony to espouse its own views on what damages should be in this case.  Worse, as support for its arguments, Crane relies heavily on inadmissible Rule 408 settlement information.  As her report demonstrates, Ms. Riley is exceptionally well-qualified to address numerous damages issues in this case, has followed established methodologies for measuring patent damages, and her testimony will assist both this Court and the jury in assessing damages in this action.  Whether or not Crane agrees with Ms. Riley's opinions is irrelevant to the admissibility of her testimony, and the appropriate time to address any disagreement Crane has with her opinion is at trial, on cross-examination.  Ms. Riley's report shows that she considered all appropriate information and that her methodology is supported by both controlling case authority and established practice in the patent damages field. Ms. Riley's testimony meets the qualifications of Federal Rule of Evidence 702 and Crane's motion to exclude should be denied.

II.    **ARGUMENT**

   A.   <u>**Ms. Riley Is Highly Qualified To Assess Damages In Patent Cases**</u>

   Ms. Riley has a Master of Business Administration and is a Certified Public Accountant with 15 years of experience in assessing intellectual property ("IP") damages.  As her resume evidences, she is currently a Managing Director with Invotex Group, a financial consulting group with a focus on IP damages and valuation.  She formerly worked for Navigant Consulting and PENTA Advisory Services, LLC, two other financial consulting groups with a focus on IP damages.  She is a member of the Licensing Executives Society and the Intellectual Property Owners Association.  She has written, or co-written, more than a dozen IP damages-related articles.  More importantly, Ms. Riley has presented expert reports in more than 20 IP damages cases and been accepted as a testifying IP damages expert at trial by 7 prior courts – not one of which found either her methodology or her conclusions unsound.  Ms. Riley is a highly qualified patent damages expert.

   Moreover, as shown in her report, Ms. Riley formed her opinions in this case by compiling and analyzing marketing, manufacturing and financial data of both parties.  In the process, she created valuable reports by which to measure damages in this case.  Among other things, Ms. Riley studied both parties reported sales of the patented products and reported those sales in a convenient and easy to use form.  *See* Exhibits D, K, K.1, and K.2 of Riley Report attached under seal as Exhibit A.  Ms. Riley further studied the incremental profits both companies obtained in making sales of the patented products, *see* Riley Exhibits O and P, studied plaintiff AMS's historic ability to manufacture the patented vending machines and its demonstrated ability to ramp that production up to make some portion of Crane's infringing sales.  *See* Exhibit G.9 of Riley Report.

Ms. Riley also analyzed the parties' respective market shares and distribution channels to analyze the extent to which AMS would have been able to make the sales actually made by Crane selling infringing product.  *See* Riley Exhibits N, N.1, and N.2.  Finally, Ms. Riley analyzed the contemporaneous documents of the parties, including the AMS's arms-length license agreements, along with the testimony of individuals involved in making product decisions in the relevant time-frame, in order to evaluate what result they would have reached in the hypothetical license negotiation required by controlling precedent.

### B. The Methodologies Employed by Riley Follow Controlling Precedent and Established, Peer-Reviewed, Analytic Approaches

Section 284 of the Patent Act provides for the award of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty."  35 U.S.C. §284.  Patent damages are usually determined by "lost profits" (the profits the patent owner would have made "but-for" the infringement), a reasonable royalty, or some combination of the two.  Lost profits can be awarded under the *Panduit* theory when the patent owner is able to establish (1) demand for the invention, (2) the absence of acceptable, non-infringing alternatives, (3) the manufacturing and marketing capacity to make the sales made by the infringer, and (4) the quantification of the profits lost.  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. Mich. 1978); *see also Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1296, 1287 (Fed. Cir. 2011).

Alternatively, lost profits can be awarded based on the market share of the patent owner. *State Industries, Inc. v. Mor-Flo Ind. Inc.*, 883 F. 2d 1573, 1577-78 (Fed. Cir. 1989).  Under the *Mor-Flo* analysis, it is assumed that the patent owner will receive its market share of the sales actually made by the infringer.  In a two-supplier market, it is presumed that the patent owner would make all of the infringer's sales. *Lam, Inc. v. John-Manville Corp.*, 718 F.2d 1056, 1065

(Fed. Cir. 1983) (when patent owner and infringer are only two suppliers of the products, "but-for" causation may be inferred).  Although the patent owner is presumed to make its market share of the infringer's sales under *Mor-Flo*, the patent owner must nevertheless establish both its capacity to make the additional sales and the incremental profits it would have earned from those sales.  This is precisely the analytical approach Ms. Riley used to measure lost profits in this case.[1]  Thus, rather than deviate from established practice as Crane claims, Ms. Riley's lost profits analyses followed controlling precedent.

Ms. Riley's reasonable royalty analysis also closely followed established precedent.  Under *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d. Cir. ), *cert. denied*, 404 U.S. 870 (1971), which is widely followed, fourteen factors are to be considered.  Those factors, which include established royalty rates, rates paid for comparable licenses, the nature and scope of the license, the commercial relationship between the licensee and licensor, the profitability, commercial success and popularity of the patented product, and the advantages of the patented product over "old modes," to name a few, were all considered by Ms. Riley.  *See* Riley Report ¶¶ 84-134.  Under controlling authority, Ms. Riley's analyses satisfy Rule 702 and *Daubert*.  *See, e.g., I4I Limited Partnership v. Microsoft Corp.*, 598 F.3d 831, 854 *aff'd*, 180 L. Ed. 2d 131 (2011) (noting that Federal Circuit has consistently upheld experts' use of a hypothetical negotiation and *Georgia-Pacific* factors).

C.    **Riley's Reasonable Royalty Analysis Followed *Georgia Pacific***

---

[1]   Crane wrongly criticizes Ms. Riley for assuming that AMS would have made all of Crane's sales "but-for" the infringement, but that is a simple misreading of Ms. Riley's report.  Ms. Riley made no such assumption.  Indeed, she capped AMS's lost profits as to even its market share due to AMS's manufacturing capacity.  *See* Riley Exhibit G.9.  Given the fact that AMS could have, and would have, increased its manufacturing plant had it doubled its sales, Ms. Riley's decision to cap manufacturing capacity to adding just a second shift is very conservative.

Crane criticizes Ms. Riley's reasonable royalty analysis because it did not "cap" the royalty rate at the rate agreed to by AMS in either its "arms-length" transactions with smaller competitors, or the amount reached in settlement of litigation with others.  Crane's criticism is improper for two reasons.  First, as a fundamental matter, the royalties AMS agreed to accept in settlement of litigation are not admissible under Federal Rule of Evidence 408.  AMS has not in any way relied upon those agreements and, as evidence of settlement by AMS, they cannot be used against AMS.  Any other result would turn the preclusive effect of Rule 408 on its head.[2]

Second, pursuant to the well-established *Georgia-Pacific* royalty analysis, Ms. Riley properly considered the reasonable royalty the parties would have agreed to as a result of a hypothetical negotiation on the date of first infringement.  Under that analysis, unlike the real world, the parties assume that the patents are valid and infringed.  *Georgia-Pacific*, 318 F. Supp. at 1120-22.  It makes no sense to suggest that a royalty negotiated with another party, at a later date, without the assumption as to validity and infringement, establishes a royalty cap, especially in the face of wide-spread infringement of the patent.  *Alpex Computer Corp. v. Nintendo Co., Ltd.,* 1994 WL 139423 (S.D.N.Y. 1994), *vacated in part*, 1994 WL 381659 (S.D.N.Y. 1994) (prospective licensees would be unlikely to pay high license fee where infringement is widespread and persistent); *see also Panduit*, 575 F.2d at 1158 (setting of a reasonable royalty after infringement cannot be treated as the equivalent of ordinary royalty negotiations among truly "willing" parties).

It is plainly not appropriate to limit the patent owner to the amount they agreed to with a different party, years after wide-spread infringement had begun.  And yet, that is precisely

---

[2]  AMS has prepared and will file a motion *in limine* seeking to exclude Crane and its experts from introducing evidence of AMS's offers to compromise or acceptance of compromise under Fed.R.Evid. 408.

Crane's posture in this case.  Using a royalty agreed to in light of widespread infringement as a cap, however, places an infringer like Crane in the unfair position of refusing a license for years, forcing a patent owner through the expensive and uncertain litigation process, only to compel the patent owner to accept the royalty rate voluntarily paid by a different party, negotiated when the validity and infringement of the patent was unknown.  Such a one-sided approach presents a classic "heads I win, tails you lose" scenario that case precedent does not support.

In any event, Ms. Riley fully considered the arms-length licenses in her royalty analysis. *See* Riley Report, ¶¶ 86, 89-91.  Just as Ms. Riley notes in her report, the license agreements AMS entered outside of litigation were negotiated with much smaller companies.  Moreover, as the sales made by those companies grew, so too grew the royalty rate.  Thus, should any of those companies become large enough to compete at the sales level at which AMS was competing, the royalty accordingly grew to $55 per vending machine sold.[3]  Crane, by contrast, refused to pay even the royalty suppressed by long-standing and pervasive industry infringement, and it sold many more than the 3,000 units per year at which the $55 per vending machine royalty applied. It was based on this combination of factors that caused Ms. Riley to treat the $55 per vending machine as the floor, not the ceiling.  *See* Riley Report ¶77.

In addition, AMS and several of the licensees who voluntarily sought a license from AMS have good working relationships with one another.  The same cannot be said of Crane.  Crane is not entitled to systematically infringe AMS's patents, attempt to drive AMS out of the market, and then demand the same license terms AMS provided to its respectful, smaller competitors. While Crane may disagree with Ms. Riley's conclusions, that disagreement is best addressed through cross-examination -- it is not a proper basis to exclude Ms. Riley's testimony.

---

[3]  Licensee Sanden-Vendo agreed to pay AMS a flat royalty of $50 per vending machine.

Crane also wrongly criticizes Ms. Riley's conclusion that AMS and Crane would have agreed upon a royalty of $75 per vending machine at the hypothetical negotiation. Once again, however, it is not Ms. Riley's analysis Crane disagrees with, it is her conclusion. Crane's arguments go to the credibility and weight of Ms. Riley's analysis and conclusions – not her methodology. Ms. Riley's report establishes that she utilized the methodology espoused in *Georgia-Pacific* and its progeny. She evaluated each of the *Georgia-Pacific* factors, including the sales volumes, the profits realized by the sales of the patented products and the other factors. In addition, Ms. Riley included three quantitative valuation methods (*i.e.,* market, cost and income methods), to identify reasonable royalty reference ranges for both AMS and Crane. During that analysis, which is supported by the AICPA Practice Aid entitled *Valuing Intellectual Property & Calculating Infringement Damages* by Michael Mard and Joseph A. Agiato, Jr., Ms. Riley also considered numerous licenses and financial documents from both parties. She then ran a full *Georgia Pacific* analysis and arrived at a royalty rate of $75 per unit.

### D. <u>Ms. Riley's Lost Profits Analysis Follows Controlling Authority</u>

As noted above, Ms. Riley applied a *Mor-Flo* market share analysis to quantify AMS's lost profits. This is a well-established methodology for computing lost profits. Under this theory of recovery, every lawful supplier of the patented article is presumed to take its own market share of Crane's infringing sales. Thus, and contrary to Crane's criticisms, Ms. Riley did not assume that AMS would be the beneficiary of all of Crane's infringing sales in the "but-for" world of patent damages, Ms. Riley assumed that each of AMS's licensees would take their own market share of Crane's infringing sales and AMS would take its own market share of those sales. Accordingly, the existence of U-Select-It ("USI") as a licensee had the effect of reducing the lost profits AMS would have made "but-for" Crane's infringement – Ms. Riley assumed that USI took its own

market share of Crane's infringing sales.  That is how the *Mor-Flo* analysis works, and it is exactly the way that Ms. Riley applied it.  *See* Riley Report, ¶¶ 52-54.[4]  Crane's disagreement with Ms. Riley's conclusions, or the weight she gave one factor over another, are not adequate bases to exclude her testimony.

Crane also wrongly criticizes Ms. Riley for purportedly failing to adequately address the first *Panduit* Factor, demand for the patented product, or to account for the second *Panduit* factor, the presence of non-infringing alternatives.  But it is Crane's criticisms that miss their mark, not Ms. Riley's analyses.  Because Ms. Riley's *Mor-Flo* analysis assumes that each of the lawful competitors would have received their market share of Crane's sales, "but-for" Crane's infringement, the existence of acceptable alternatives, the second *Panduit* factor, is not relevant to the lost profits analysis.[5]

As to the first *Panduit* factor, demand for the patented product is usually demonstrated by sales of the product and its commercial success.  Indeed, the substantial number of sales by the accused infringer or infringing products containing the patented features itself is compelling evidence of the demand for the product.  *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed. Cir. 1984), *see also Parker-Hannifin Corp. v. Champion Labs., Inc.*, 2008 U.S. Dist. LEXIS 32921, 18-19 (N.D. Ohio Apr. 22, 2008).  Here, to establish demand, Ms. Riley

---

[4] Crane faults Ms. Riley for failing to account for the market share of Signature and Seaga in her analysis, but both are smaller competitors and Signature appears to have gone out of business a number of years ago. Moreover, as this Court is well aware, Seaga failed to make any sales reports, and no sales data was available for that company.  When the amount of damages cannot be ascertained with precision, any doubts regarding that amount must be resolved against the infringer.  *Lam*, 718 F. 2d at 1065.

[5] Incredibly, Crane purports to fault Ms. Riley for providing too little consideration to what Crane might have done instead of infringing.  Though the measure of damages can be flexible, it cannot be so flexible as to allow an infringer to avoid damages by suggesting that it would have behaved differently if only it knew that the patent was valid and infringed.  All known damages theories require the parties to accept that the patent is both valid and infringed – what Crane could have done, or should have done, is beside the point.  *Panduit*, 575 F.2d at 1162 (introduction of alleged non-infringing alternative years after the date of first infringement does not provide evidence that "acceptable substitutes were on the market on the focus-date of first infringement").

relied upon the substantial sales of the patented product by AMS and Crane, as well as the industry adoption of the patented article as the industry standard. *See* Riley Report, ¶¶32-37. Ms. Riley's report identifies substantial evidence of demand for the patented vend sensor-equipped vending machine, including the decision by many competitors to take a license under AMS's patents.

Crane claims that Ms. Riley failed to adequately account for factors other than the patented feature that "drive" customer purchases. But it is Crane who is confused. The question of factors that "drive" customer purchases is directed to the so-called "entire market value rule." Under the entire market value rule, it is appropriate to expand the damages based from just the patented article (in this case, vend-sensor equipped glass front snack machines) to include unpatented products sold with the patented product. *See Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1549 (Fed. Cir. 1995). The entire market value rule is an entirely different standard, not at issue in this case, and it is not a part of either a *Panduit* analysis or a *Mor-Flo* analysis.

Crane inserts this issue in order to create the illusion that the present fact pattern fits the holding in *IP Innovation L.L.C. v. Red Hat, Inc*., 705 F. Supp. 2d 687 (E.D. Tex. 2010). But the plaintiff's damages expert there did rely upon the entire market value rule to expand the royalty base from the patented workspace switching feature to Red Hat's entire operating system without establishing that users even enabled the optional switching feature claimed. *Id.* at 689-90. Here, the scope of the damages base and the scope of the patent claim match – both are a vend sensor equipped vending machine. Thus, the holding in *IP Innovation* limiting application of the entire market value rule has no application to the facts here.[6]

---

[6] The damages expert in *IP Innovations* also improperly relied upon industry surveys, not any license connected to the patent-in-suit, to "arbitrarily pick" a royalty. *Id.* at 690. That issue is also not present here.

In any event, Crane itself recognized that its customers demanded the patented invention in 2000 and has included the patented optical vend detection system in every vending machine it has sold for the past 10 years.  *See* Exhibit B (Crane Capital Expenditure Request for adding sensor feature) (filed under seal).  Ms. Riley specifically called out and relied on that exhibit, and similar documents, in her report.  *See* Riley Report, ¶¶78, 102, 108.

Finally, although the contents of the Riley report directly refute the contention, Crane asserts that Ms. Riley failed to adequately account for different distribution channels and customer bases, thereby overstating AMS's marketing and sales capacities.  Ms. Riley, however, reviewed and researched AMS's marketing department and distribution channels.  *See* Riley Report, ¶¶ 40-45, Riley Report Exhibit E (schedule showing distributor overlap).  She conducted interviews and analyzed Crane's own internal reflections on the competition between AMS and Crane, created several tables that identified vending machines manufactured by Crane that had similar features and price points to AMS's products, and concluded that AMS's marketing and distribution channels were adequate to make certain of the sales Crane actually made in the "but-for" world of patent damages.  Indeed, prior to the introduction of the infringing product, Crane documented sales made by AMS to "Crane" customers who wanted the patented feature.  *See* Exhibits C, D (filed under seal).

## III.    CONCLUSION

Ms. Riley is exceptionally well-qualified to address numerous damages issues in this case, has followed established methodologies for measuring patent damages, and her testimony will assist both this Court and the jury in assessing damages in this action.  Whether or not Crane agrees with Ms. Riley's opinions is irrelevant to the admissibility of her testimony and the

appropriate time to address any disagreement Crane has with her opinion is at trial, on cross-examination.

**AUTOMATED MERCHANDISING SYSTEMS INC.**
by its Attorneys

*/s/ Charles F. Printz, Jr.*
Charles F. Printz, Jr. (WVSB#2985)
BOWLES RICE MCDAVID GRAFF & LOVE LLP
P.O. Drawer 1419
Martinsburg, West Virginia 25402-1419
Telephone: 304-263-0836
Facsimile:  304-267-3822

James D. Berquist
Donald L. Jackson
DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
4300 Wilson Blvd., Suite 700
Arlington, Virginia 22203
Telephone: 703-894-6400
Facsimile:  703-894-6430

## CERTIFICATE OF SERVICE

I, Charles F. Printz, Jr., hereby certify that I electronically filed **Plaintiff AMS's Opposition to Crane's Motion to Exclude the Testimony of AMS's Damages Expert Michele Riley** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record who are deemed to have consented to electronic service.

Dated this 10th day of February 2012.

*/s/ Charles F. Printz, Jr.*
Charles F. Printz, Jr.

-11-